**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| SULLIVAN TIRE OF MAINE, LLC and SULLIVAN TIRE CO., INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> CENTRAL TIRE CO., INC., RENE THERRIEN, DOUGLAS THERRIEN, and JEFFREY THERRIEN, <br><br> *Defendants.* | CASE NO. _____ |

**VERIFIED COMPLAINT (INJUNCTIVE RELIEF SOUGHT)**

Plaintiffs Sullivan Tire of Maine, LLC ("Sullivan Tire ME") and Sullivan Tire Co., Inc. ("Sullivan Tire Co." and, collectively with Sullivan Tire ME., "Sullivan Tire"), by and through their undersigned attorneys, bring this Verified Complaint against the Defendants Central Tire Co., Inc. ("Central"), Rene Therrien ("Rene"), Douglas Therrien ("Doug"), and Jeffrey Therrien ("Jeff") as follows:

**INTRODUCTION**

1.    Defendants Doug and Jeff are using business assets their father sold to Sullivan Tire – including the trade name "Central Tire" and two lists of customers they misappropriated from a company computer – to operate a competing business in the immediate vicinity of the former Central Tire location in Sanford, Maine that is now operated by Sullivan Tire, thereby violating the parties' Asset Purchase Agreement, the federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, the Maine Uniform Trade Secrets Act, M.R.S.A. 10 §§ 1541-1548, the Lanham Act, 15 USC § 1125(a), and other laws as described herein.

1

2.      The Asset Purchase Agreement contains an express covenant prohibiting Rene, as Seller Shareholder, and his family members, including Doug and Jeff, from ever using Central Tire's confidential or proprietary information to operate a competing business within 50 miles of the two former Central Tire locations in Sanford and Shawmut, Maine.  Additionally, in connection with their employment with Sullivan Tire following the sale, Doug and Jeff agreed to maintain the confidentiality of Sullivan Tire's confidential and proprietary information.  After resigning from Sullivan Tire, Doug and Jeff are now brazenly doing exactly what their contractual agreements prohibit – operating a competing business under the trade name "Central Tire" – a name they have no right to use – less than three (3) miles from Sullivan Tire's Sanford location, and using the confidential and proprietary information they sold to and then misappropriated from Sullivan Tire, including the identities and contact information of customers, sales methods, pricing and discount information.

3.      As detailed herein, the Defendants' conduct is both willful and egregious.  Shortly after Jeff resigned from his position with Sullivan Tire, he used a key he possessed in his capacity as landlord to access the Sanford premises when the business was closed for the New Year's holiday.  He removed physical files, a desktop computer and a computer server containing valuable and confidential information about Central's business – all of which belonged to Sullivan Tire.  A forensic examination of the computer demonstrates, among other things, that on January 10, 2026, Jeff accessed 111 folders and files, plugged multiple removable storage devices into the computer, and deleted 196 files relating to Central's business prior to returning the equipment to Sullivan Tire.  Two of the files Jeff accessed contained lists of customers, at least forty-four (44) of which are current Sullivan Tire customers.  Further egregious misconduct on the part of Jeff and Doug is detailed below.

4.    As a direct result of the Defendants' unlawful actions, Sullivan Tire has lost numerous customer relationships and greater than $100,000 in profits in the first four months of 2026, which amounts will continue to grow unless Defendants' behavior is enjoined by this Court. Accordingly, Sullivan Tire brings this action seeking: a) to enjoin Defendants from conducting business using the name "Central Tire" or any other name used by the former Central Tire business prior to the sale to Sullivan Tire; b) to enjoin Defendants from using Central's or Sullivan Tire's confidential information to conduct business, including the identities of customers; c) to enjoin Defendants from providing any goods or services to former customers of Central or Sullivan Tire's existing customers from a site located with 50 miles of Sullivan Tire's Sanford and Shawmut locations, and d) an award of damages arising from Defendants' wrongful actions.

**PARTIES**

5.    Sullivan Tire Co. is a Massachusetts corporation with a principal place of business at 41 Accord Park Drive, Norwell, Massachusetts.

6.    Sullivan Tire ME is a limited liability company organized under the laws of Delaware with a principal place of business at 41 Accord Park Drive, Norwell, Massachusetts. Sullivan Tire ME's sole member is Sullivan Tire, Inc., a Delaware corporation with a principal place of business at 41 Accord Park Drive, Norwell, Massachusetts.

7.    Central is a corporation organized under the laws of Maine with a principal place of business at 122 Cyro Drive, Sanford, Maine.

8.    Rene is an individual residing in Springvale, Maine.  Rene is the sole shareholder of Central.

9.    Doug is an individual residing in Waterboro, Maine.

10.    Jeff is an individual residing in Springvale, Maine.

3

## JURISDICTION AND VENUE

11.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) based on complete diversity of citizenship between the parties and because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

12.     This Court may exercise personal jurisdiction over Central pursuant to 14 M.R.S.A §704-A, as it organized under the laws of Maine, has its principal place of business, transacts business, owns real estate, and has engaged in tortious conduct in the State of Maine.

13.     This Court may exercise personal jurisdiction over Rene, Doug, and Jeff pursuant to 14 M.R.S.A §704-A, as each of them is domiciled, transacts business, and owns real estate in the State of Maine.  In addition, Doug and Jeff have engaged in tortious conduct in the State of Maine.

14.     Venue is proper in United States District Court for the District of Maine under 28 U.S.C. § 1391(b) because, as set forth above, Central, Rene, Doug, and Jeff are domiciled in this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

## BACKGROUND

15.     Sullivan Tire Co. is a family business established in 1955 that sells automobile and commercial truck tires and performs automotive repair services at various locations throughout New England.

16.     Prior to its sale of assets to Sullivan Tire, Central operated two commercial tire sales and service locations in Sanford and Shawmut, Maine.  Central also operated a commercial tire retreading business from a plant located at 122 Cyro Drive, Sanford, Maine.  As detailed below, Central continues to conduct business operations from that location.

<u>Sullivan Tire's Purchase of Central's Tire Sales and Service Business</u>

17.    On September 27, 2022, Sullivan Tire ME, an affiliate of Sullivan Tire Co., entered an agreement to purchase the assets of Central's tire sales and service business.

18.    The purchase was documented in an Asset Purchase Agreement dated September 27, 2022 (the "<u>APA</u>") between Central, as Seller, its owner Rene, as Seller's Shareholder, and Sullivan Tire ME, as Buyer.  In addition, Rene's sons, Doug and Jeff, who were employed in senior roles with Central at the time of the sale, executed the APA as to Section 10, titled "Restrictive Covenants."  A true and accurate copy of the APA is attached hereto as <u>Exhibit A</u>[1].

19.    The sale of assets contemplated in the APA closed on October 12, 2022.  A true and accurate copy of the Bill of Sale from the closing of the sale is attached hereto as <u>Exhibit B</u>[2].

20.    Since the closing of the sale of assets, Central continues to own its former business premises located at 1307 Main Street, Sanford, Maine (the "<u>Sanford Premises</u>"), which it leases to Sullivan Tire ME and from which Sullivan Tire now conducts business. From the Sanford Premises, Sullivan Tire provides goods and services to customers with business operations located in the State of Maine and in other states, including New Hampshire, Massachusetts, and Vermont.

21.    Sullivan Tire ME also leases the Shawmut, Maine location from an affiliate of Central.

22.    As indicated in the Bill of Sale, Sullivan Tire ME purchased the following assets from Central, among others, in exchange for the Purchase Price:

> a)    All of the goodwill of the Business known as Central Tire Co., Inc. as operated by Seller;

---

[1] The purchase price, which is not relevant to this dispute, has been redacted from the APA.
[2] The purchase price has been redacted from the Bill of Sale.

b)      All trade names or other names under which Central Tire Co., Inc., business is conducted by Seller, including but not limited to, any signage and other materials containing and displaying such names;

c)      Seller's intellectual property (as defined in a certain Asset Purchase and Sale Agreement Signed by the Sellers and Buyer), including without limitation the specific Intellectual Property as set forth on Exhibit 1A(c) of said Asset Purchase and Sale Agreement;

d)      All of fixtures, inventory . . . contracts (including without limitation leases and subleases), licenses (to the extent transferable), vendor lists, customer lists, and books and records related to the Business except the Seller's corporate records which were excluded in said Asset and Purchase and Sale Agreement;

*See* Exhibit B (Bill of Sale).

23.     Section 10 of the APA, titled "Restrictive Covenants", contains two restrictive covenants.  First, Section 10A prohibits Doug and Jeff from engaging in any tire and/or automotive service business within 50 miles of Central's Sanford and Shawmut locations for two (2) years following the closing of the sale.

24.     Second, Section 10B provides that Seller (Central) and Seller's Shareholder (Rene):

shall not use, or permit any family members of Seller Shareholder or Seller Shareholder Spouse to use, any proprietary or confidential information of Seller, including but not limited to sales methods and customer lists, in any Competing Business, and shall be liable for any actions taken by any of such family members that would be deemed a breach of this Agreement as if the Seller [or] Seller Shareholder . . . had taken those actions directly.

25.     The term "Competing Business" is defined in Section 10 as any tire and/or automotive service business within fifty (50) miles from the Sanford or Shawmut locations.

26.     Section 10B's prohibition on the Therrien family's use of Central's confidential information in a Competing Business is not limited in time or subject to any expiration.

27.     Section 10(B) also provides that Rene will be personally liable for any breach of the provision by his family members.

<u>Doug's and Jeff's Employment at Sullivan Tire</u>

28.     Following the sale of Central's assets to Sullivan Tire, Doug and Jeff worked for Sullivan Tire Co. in management-level positions.  Each worked from the Sanford Premises.

29.     Jeff was an Assistant Manager in Sanford for the entirety of his employment with Sullivan Tire.  Doug was the Manager of Sullivan Tire's Sanford location for approximately one year before transitioning to a sales role for the remainder of his employment.

30.     When Doug and Jeff began working for Sullivan Tire Co. in October 2022, they each received a copy of the Sullivan Tire and Auto Service Employee Handbook (the "<u>Employee Handbook</u>") and signed an Acknowledgement Form acknowledging their receipt of the Employee Handbook.  A true and accurate copy of the Employee Handbook in effect during the Therriens' employment is attached hereto as <u>Exhibit C</u>.  Attached as <u>Exhibit D</u> and <u>Exhibit E</u> are true and accurate copies of the Acknowledgement Forms executed by Doug and Jeff, respectively.

31.     Sullivan Tire Co.'s Employee Handbook provides, in relevant part:

**Confidential Information**

All information pertaining to Sullivan Tire, its customers, employees, and visitors is strictly confidential, even after your employment ends. It is the responsibility of each employee to ensure that information is not improperly or accidentally disclosed. Confidential information includes, but is not limited to, contents of customers' vehicles, dates or nature of service, names and addresses of customers, and any other information pertinent to Sullivan Tire customers. In addition, this Policy applies to any and all records, memorandums, strategies, customer lists and prospects and

employee information, such as social security number, home addresses, and telephone numbers. As such, they are to be carefully safeguarded and kept current, relevant, and accurate.

Records should be disclosed only to authorized Sullivan Tire employees having a "need to know," or pursuant to lawful process in accordance with Sullivan Tire procedures governing the permissibility and means of disclosure. Such information should not be disclosed to third parties except as expressly permitted in Sullivan Tire procedures or if Sullivan Tire becomes legally obligated to do so.

**Proprietary Information**

Proprietary information about Sullivan Tire and its plans, financial condition and earnings, and business operations and processes, is confidential and may not be disclosed to any person. Sullivan Tire employees should use care not to discuss Sullivan Tire business in any place or manner that would in any way impair its competitive position in the industry. Information about Sullivan Tire should not be given to persons outside Sullivan Tire unless it has been previously disclosed publicly. Requests for such information should be referred to Human Resources.

Ex. C, p. 26-27.

32.     Per these policies, all information pertaining to Sullivan Tire's customers, including their names, addresses, and contact information, as well as the pricing those customers receive on their purchases of tires from Sullivan Tire, is considered to be confidential information. That information is available to employees only on a "need to know" basis.

33.     In addition to its Confidential Information and Proprietary Information policies, Sullivan Tire takes the following measures to protect its confidential information:

a.  All employees use unique passwords to access Sullivan Tire systems, which are changed every twelve (12) months. Domain administrator passwords are changed every 180 days.

b.  Access to certain information and systems is limited based on employee role and controlled using Microsoft Active Directory and Entra Authentication.

c.  Keys are required to enter Sullivan Tire's buildings. Key cards are required to access the company's corporate office in Norwell, Massachusetts and distribution center in Taunton, Massachusetts, both of which house data center/server rooms. The server rooms are secured using key cards with access restricted to limited individuals. Logs are maintained of access and attempted access to those rooms.

34.     Given their managerial roles with Sullivan Tire, Doug and Jeff both had access to the company's confidential and proprietary information, including information that identified customers and the pricing they received on tires.

35.     On October 6, 2025, Doug sent an email to Sullivan Tire's Commercial Division Manager Ryan McMullen saying that he was resigning from his position with Sullivan Tire and that his last day would be October 31, 2025.  Doug indicated in his email that he was "*not going to Pete's or MCT*", which refer to two competitors of Sullivan Tire.  He further stated: "*I am going to scale back and do my State of Maine commercial inspections & work two days a week for our tenant (Holland Power)*."  A true and accurate copy of the October 6, 2025 email is attached hereto as Exhibit F.

36.     According to the website for the Secretary of State's Bureau of Corporations for the State of Maine, the entity known as "Central Tire Co., Inc." was administratively dissolved on September 3, 2025 as a result of its failure to file its Annual Report for the year 2025.

37.     Central filed the missing Annual Report and was reinstated to active status on October 27, 2025, four (4) days prior to Doug's final day of work at Sullivan Tire.  *See* https://apps3.web.maine.gov/nei-sos-icrs/ICRS?CorpSumm=19680048+D (last visited April 29, 2026).

38.     Just prior to his last day of work, Doug indicated to Sullivan Tire's Director of Human Resources that he was "tired and burned out" and needed a break from the tire business, or words to that effect.  He further stated he was going to Florida for a little while and he was going to work part-time at another one of his businesses outside of the tire business when he returned.

9

39.     Jeff resigned from his position with Sullivan Tire in December 2025, with his final day to take place on January 5, 2026.  Sometime between Christmas and New Year's Day, Mr. McMullen spoke to Jeff about his plans following his tenure at Sullivan Tire.  Jeff said that he needed time off to address family issues and spend time with his kids and that he no longer wanted to work a full-time job.  Further elaborating, Jeff told Mr. McMullen that he and his brother were renting the former Central Tire retreading plant in Sanford, Maine to a utility company and he planned to work part time maintaining that company's trucks.  He also said that he and his brother intended to continue to operate as a commercial vehicle inspection site from the Sanford site, an ongoing business the Therriens operate on Saturdays.

40.     As a security measure, it is the policy of Sullivan Tire to immediately cut off access to the company's computer systems and physical files when an employee provides advanced notice of his/her resignation from the company if there is any reason to believe the employee intends to work for a competitor.  In such instances, the company will continue to pay the resigning employee through the notice period, but the employee is no longer permitted to perform any work, must return all company property, including computers and vehicles, and can no longer access any of the company's systems or facilities.

41.     As a result of their managerial roles with Sullivan Tire Co. and their experiences with several employees who had previously resigned, Doug and Jeff were both aware of this policy.

42.     Doug and Jeff knowingly misrepresented their plans following their resignations from the company so that Sullivan Tire would permit each of them to continue working from the time they provided notice of their resignations up to the final dates of their employment, rather than cutting off their access to the company's computer systems and physical files immediately

upon notice of resignation. This allowed Doug and Jeff to have ongoing access to Sullivan Tire's confidential information while they were planning (if not actively engaging in) the resurrection of the tire sales and service business under the name Central Tire.

<u>Jeff's Misappropriation of Sullivan Tire's Confidential Information</u>

43.    Following Sullivan Tire's purchase of Central's assets, Central's physical files were stored in filing cabinets located in an office at the Sanford Premises. A Dell desktop computer and computer server that previously belonged to Central were also stored in the office.

44.    Due to a concern that Central Tire's computer systems were infected with a virus, Sullivan Tire did not integrate Central Tire's customer information or other data into Sullivan Tire's computer systems. Instead, Sullivan Tire's employees would consult the physical files or files on Central's computer if they needed an address or phone number for a customer that had previously purchased tires or services from Central.

45.    Sometime during the period after Sullivan Tire closed for business on December 31, 2025 and when it opened for business on January 2, 2026 following the New Year's Day holiday, Jeff gained access to the Sanford Premises. He used a key to the building that he possessed in his capacity as Sullivan Tire's landlord.

46.    Jeff did not request permission to access the building or provide advanced notice to anyone at Sullivan Tire that he would be there.

47.    He removed the filing cabinets containing Central's physical files, as well as the Dell computer and computer server. He also removed certain notes, post-it notes and other references that were created after Sullivan Tire's purchase of Central's assets, which contained customer contact information, customer leads, and other notations.

11

48.    Because the Therriens owned other business assets and operated businesses that were not sold to Sullivan Tire, the removal of Central's physical files from the Sanford Premises did not pose an immediate concern to Sullivan Tire's employees in Sanford when they discovered that the office had been emptied out on January 2, 2026.  However, Sullivan Tire's employees were not aware at that time that Jeff had removed the Central desktop computer and server.

49.    All of the physical files and notes relating to the tire sales business removed by Jeff from the Sanford Premises, as well as the desktop computer and server and the data stored on them, were the property of Sullivan Tire ME by virtue of its purchase of Central's tire sales and service business in October of 2022.

50.    Shortly after discovering that Jeff had accessed the premises without authorization, Sullivan Tire changed the locks at the Sanford Premises.

51.    On February 13, 2026, Jeff called the Regional Operations Manager Anton "Billy" Folger, III and notified him that he would be dropping off a computer and a computer server at the Sanford Premises.  Jeff indicated he had removed the computer and server when he was removing business files of Central following his resignation in order to remove personal photographs from the computer.  He left the computer equipment at the Sanford Premises that day after having been wrongfully in possession of it for approximately six (6) weeks.

52.    Neither Mr. Folger, nor anyone else at Sullivan Tire was previously aware that Jeff had removed any computer equipment from the Sanford Premises.

53.    Mr. Folger promptly sent the Dell desktop computer and server to Sullivan Tire's Information Technology staff at the Sullivan Tire headquarters at 41 Accord Park Drive, Norwell, Massachusetts.

54.    None of the physical files, notes or other documents removed from the Sanford Premises by Jeff have been returned to Sullivan Tire.

55.    Sullivan Tire engaged computer forensics experts at Innovative Driven, LLC to perform a forensic examination of the desktop computer removed by Jeff from the Sanford Premises.  As set forth in the Declaration of Christopher VanAernam, the forensic examination included the following findings:

a. On December 26, 2025, at 11:30 AM ET, a USB Device was plugged into the Desktop and files with the following file names were accessed from the device:

   i.  F:\InventoryHistory.csv
   ii.  F:\InventoryHistory2020.xls
   iii.  F:\Items.xls

b. On January 10, 2026, between 11:02 AM and 11:57 AM ET and on January 12, 2026, between 8:42 AM and 8:48 AM ET, a total of 111 unique folders and files were accessed on the C drive of the Desktop within the user profile "jeff.", including the following files:

   C:\Users\jeff\Documents\PHONELIST.xls
   C:\Users\jeff\Documents\ExternalList1.csv

c. Between January 10, 2026, at 11:03 AM ET to January 12, 2026, at 8:47 AM ET, a total of 196 files were permanently deleted within the user profile "jeff" form the Documents and or Desktop folders. The deleted files included the following file names:

   i.  C:\Users\jeff\Documents\Chart of Accounts.xls
   ii.  C:\Users\jeff\Documents\ExternalList1.csv
   iii.  C:\Users\jeff\Documents\ExternalList2.csv
   iv.  C:\Users\jeff\Documents\Auto shop.docx
   v.  C:\Users\jeff\Documents\TIRECHART.docx
   vi.  C:\Users\jeff\Desktop\CRI tread list.pdf
   vii.  C:\Users\jeff\Documents\Office inventory.docx
   viii.  C:\Users\jeff\Documents\2021 DEALER PRICE LIST 85% ON FACTOR.xlsx
   ix.  C:\Users\jeff\Documents\2021 RDM Specs.xlsx
   x.  C:\Users\jeff\Documents\Central Tire Hercules Price Sheet 1.21.21.xlsx

d. On January 23, 2026, at 1:40 PM ET, a USB Device adapter was plugged into the Desktop. This adapter is used to plug non-USB drives into a USB port on computers.

13

At 1:40 PM ET a folder was created on a drive mapped to E: and called "jeff@centraltire". At 1:50 PM ET, a folder was created within this folder called "zchrome". At 2:07 PM, a file was created within this folder called "Chrome Passwords.csv", which is consistent with a user exporting their Google Chrome passwords to a CSV file to be used elsewhere. At 2:08 PM ET, a file was created within the "jeff@centraltire" folder labeled "bookmarks_1_23_26.html" which is consistent with a user exporting their Google Chrome Bookmarks to be used elsewhere.

e. In the month of December 2025, there were hundreds of web browser activity entries relating to the access of a personal Gmail account, jefftherrien12@gmail.com, and a Roundcube webmail account, the associated email address for which could not be identified. These accounts could have been used to send data to other accounts. However, due to the nature of accessing email accounts via the web browser, that determination could not be made from an analysis of the computer alone.

56. The file identified as "C:\Users\jeff\Documents\ExternalList1.csv" accessed by Jeff contained a list of thirty (30) businesses and municipalities and their phone numbers. At least eleven (11) of those names are current Sullivan Tire customers.

57. The file identified as "C:\Users\jeff\Documents\PHONELIST.xls" accessed by Jeff contained a list of eighty (80) businesses names. At least thirty-five (35) of those names are current Sullivan Tire customers (two of which were also listed in the "ExternalList1.csv" document).

Central's Business Operations Using the "Central Tire" Trade Name

58. Following Jeff's resignation from Sullivan Tire in early 2026, Sullivan Tire's representatives in Sanford began hearing rumors that he and Doug were operating a commercial tire sales and tire retreading business using the name "Central Tire".

59. In December 2025, Todd Wilson, a sales employee of Sullivan Tire, drove past the former Central Tire retreading facility at 122 Cyro Dr. in Sanford and saw that a "Central Tire" sign had been installed above the door.

60. On February 9, 2026, a representative of a customer known as Beauregard Equipment Inc. told Mr. Wilson that they didn't need any tires because he had just purchased ten

14

(10) tires the prior week from "Doug at Central Tire." A second customer, Brex Corp., has also informed Mr. Wilson that they are purchasing tires from the Therriens.

61.    As specifically set forth in the Bill of Sale, Sullivan Tire ME acquired all rights to the name "Central Tire" as of October 12, 2022, and never authorized the Therriens to use it.

62.    On February 12, 2026, Sullivan Tire's Commercial Division Manger Ryan McMullen performed a search for the term "Central Tire" using the Google search engine. The search results, a portion of which are set forth below, showed that a business operating under the trade name "Central Tire" was open for business and is located at 122 Cyro Dr., Sanford, Maine 04073, the site of Central's tire retreading facility:



63.    Central Tire's website at https://www.centraltire.com/ is controlled by the Defendants and remains active, thereby causing confusion in the marketplace.

64.    In addition, since his resignation from Sullivan Tire, Doug has made numerous phone calls, sent text messages and engaged in in-person communications with employees of Sullivan Tire to tell them that he was working at his own tire shop. During those calls, Doug

15

attempted to recruit certain Sullivan Tire employees to leave their positions and join the Therriens' tire business.

65.    On February 18, 2026, Sullivan Tire Co.'s outside counsel James F. Radke sent letters to Jeff, Doug, and their father Rene demanding they cease conducting business using the "Central Tire" trade name, identify and return any business records and documents relating to the former Central Tire business or Sullivan Tire, and cease using any of Sullivan Tire's confidential information in the conduct of their business.

66.    On February 19, 2026, Attorney Radke received an email from the address ctinspection1@gmail.com signed "Doug, Jeff & Rene Therrien," which stated as follows:



Central Tire/Sullivan Tire

CT Inspection <ctinspection1@gmail.com>
To ● James F. Radke
Retention Policy   Inbox Items Older Than 120 Days (4 months)
ⓘ You replied to this message on 3/13/2026 2:59 PM.

☺   ↩ Reply   ↩ Reply All   → Forward   ⯆   ···
Thu 2/19/2026 5:11 PM

Expires  6/19/2026

Dear Mr. Radke

We will immediately cease-and-desist all business operations using the Central Tire trade name.
The computer was returned on 2/13 and Billy Folger (the Sanford Commercial Manager) was notified. Furthermore we will comply with Sullivan Tire's confidentiality obligations.

Thank you
Doug, Jeff & Rene Therrien

A true and accurate copy of the February 19, 2026 email is attached hereto as Exhibit G.

67.    The same day, on February 19, 2026, Jeff sent a text message to Mr. McMullen that read: "*Not Sure if Billy Folger let you know, I returned the computers. It was an honest mistake. I did want to get my pictures of my kids off of my work station.*"  A true and accurate copy of the text message is attached hereto as Exhibit H.

16

68.     On March 3, 2026, a representative of Michelin, one of the largest tire manufacturers in the world, sent a spreadsheet to Sullivan Tire with a list of accounts that had signed up to purchase tires from Michelin under its Alliance Associate Dealer program (the "AAD Program").  Sullivan Tire received the spreadsheet of AAD program accounts because it is a tire wholesaler authorized to sell tires to those accounts as secondary distributors.  Participants in the AAD program must commit to purchasing a minimum of 250 consumer tire units from Michelin.

69.     Line 4544 of the spreadsheet of Michelin's AAD program accounts identifies "Central Tire, Co." as an AAD account, with the same business address in Sanford used by the Defendants:

| Bill To Customer ID | Bill To Customer DESC | Ship To Customer ID | Ship To Customer DESC | Ship To Phys Address 1 | Ship To Phys City | Ship To Phys State/Province | Ship To Phys Zip/Postal ID |
|---|---|---|---|---|---|---|---|
| 1582573 | CENTRAL TIRE, CO. | 1582574 | CENTRAL TIRE, CO. | 122 CYRO DRIVE | SANFORD | ME | 04073 |

True and accurate copies of Michelin's email to Sullivan Tire and relevant portions of the spreadsheet of program participants are attached hereto as Exhibit I.

70.     In addition, on or about April 28, 2026, Sullivan Tire received a spreadsheet from Nokian Tyres, a Finnish tire manufacturer, of participants in Nokian's Pioneer program. Participants in the program are eligible to receive rewards and marketing support, participate in events, and have annual sales targets for consumer tires.  Sullivan Tire received the spreadsheet of Pioneer program accounts because Sullivan Tire is a tire wholesaler authorized to sell tires to those accounts as secondary distributors.

71.     Line 91 of the spreadsheet of Nokian's Pioneer program accounts received by Sullivan Tire identifies "Central Tire Company" as a program account, with a Sanford, Maine business address as set forth below:

| First Name | Last Name | City | State | Store | Program |
|---|---|---|---|---|---|
| Doug | Therrien | Sanford | ME | Central Tire Company | Pioneer |

72.     On May 13, 2026, Mr. Wilson visited a customer located in Scarborough, Maine. While at the premises, he saw Doug Therrien speaking with the customer.  Doug was wearing a jacket and shirt that both read "Central Tire."

### Defendants' Additional Uses of Sullivan Tire's Confidential and Proprietary Information for their Benefit

73.     On February 20, 2026, Doug came to the Sanford Premises and purchased a commercial truck tire using the Sullivan Tire customer account identified as account number 4044422, which corresponds to a commercial body shop business (the "MAB Account") that purchases tires from Sullivan Tire on a wholesale basis and receives a significant discount on the price of the tires.  Thus, any purchase made on the MAB account would be substantially discounted from the ordinary price of the tire.

74.     As a result of his position with Sullivan Tire, Doug had access to all of Sullivan Tire's pricing information and he was aware that the MAB account received a substantial discount on tires purchased on its account.

75.     Doug paid for the tire using his personal credit card.  He told the Sullivan Tire representative who sold him the tire that "Billy" – referring to Anton "Billy" Folger, III – had told him it was okay for him to make the purchase on the MAB account to obtain the discounted pricing.

76.     This was untrue, as Doug never requested nor received permission from Mr. Folger nor anyone else at Sullivan Tire to purchase any tires using a customer discount.

18

77. Upon information and belief, Doug purchased the tire using his knowledge of Sullivan Tire's customer discount in order to receive the best possible price for the tire, which he intended to mark up and re-sell to another customer.

78. From the time of Sullivan Tire's purchase of Central's tire sales and service business until April 3, 2026, Doug's stepson Craig Therrien ("Craig") was employed by Sullivan Tire Co. as a delivery driver in Sanford.

79. Craig's primary job duties consisted of driving a box truck owned by Sullivan Tire to drop off tires to commercial customers and pick up any tires that customers needed to be retreaded by Sullivan Tire. He would also inspect tires and make recommendations to customers concerning the need for new tires.

80. As a result of his regular contact with Sullivan Tire's customers, Craig had considerable knowledge of the customers' needs for commercial tires and retreading services, as well as the pricing and discounts offered by Sullivan Tire to those customers.

81. All vehicles owned by Sullivan Tire and used by employees are equipped with a GPS tracking device.

82. On April 3, 2026, Craig failed to show up for work for the sixth (6th) day in a row. When he was contacted, he said that he was sick and could not make it to work. That was the thirteenth (13th) sick day that Craig had taken from work in 2026 without providing a doctor's note or other evidence of illness.

83. As a result of the unusually high number of sick days taken by Craig, Mr. McMullen checked the GPS location data from Craig's company vehicle. That data shows that on three (3) occasions in 2026, Craig's company vehicle was driven to Central's retreading facility located at

19

122 Cyro Dr., Sanford, Maine 04073 during work hours, while Craig was being paid by Sullivan Tire.

84. Upon information and belief, Craig was performing work for Doug, Jeff and Central and/or providing them with information to be used in their tire sales and service business while being paid to work for Sullivan Tire, including during all or a portion of the thirteen (13) "sick days" he took in 2026.

85. Following the discovery that Craig had been driving Sullivan Tire's truck to the Therrien's place of business during work hours without authorization, and his failure to show up for work for six (6) consecutive days without a doctor's note, Sullivan Tire Co. terminated Craig Therrien's employment on April 3, 2026.

86. The same day, on April 3, 2026, Mr. Wilson went to the former Central Tire retreading facility in Sanford to drop off mail for the Therriens that had been delivered to Sullivan Tire. While at the premises, Mr. Wilson observed Randy Thyng, a tire technician employed by Sullivan Tire, driving Doug's personal vehicle with tires in the back of the truck.

87. While inside the building, Mr. Wilson observed Mr. Thyng unloading tires from the truck while wearing a "Central Tire" shirt. Mr. Thyng had called in sick to work that day for his position at Sullivan Tire. As a result of Mr. Wilson's report, the decision was made to terminate Mr. Thyng's employment that day.

88. While Mr. Wilson was at the former Central Tire retreading facility at 122 Cyro Dr. in Sanford on April 3, 2026, he observed vehicles belonging to the following five (5) different companies in the parking lot:

   a. Winding Brook Turf Farm;
   b. Big Guy's Landscaping;
   c. Doucette Forestry Recycling;
   d. Seth McCoy's Trucking & Excavating;

20

e.    Sevigny's Property Maintenance; and

89.    All five (5) of the foregoing companies observed at the Central facility were legacy customers of Central prior to the sale of Central's business to Sullivan Tire in October 2022 and are existing customers of Sullivan Tire.

<u>Effect on Sullivan Tire's Business</u>

90.    The sale of commercial tires is a highly competitive business with relatively small profit margins.   The price of the tires is the primary driver of sales to retail and wholesale customers.  Commercial truck tires generally cost at least twice as much as regular consumer tires, and potentially many times more for tires used on heavy equipment.  For those reasons, Sullivan Tire considers the identities of its customers and the prices at which it sells tires to individual customers to be highly confidential.

91.    Any commercial tire sales business competing in the same geographical market as Sullivan Tire would have a significant and unfair competitive advantage if it knew the identities of Sullivan Tire's customers and/or its pricing and discount structures for the commercial tires it sells.  This information would allow the competing business to directly target Sullivan Tire's existing customers and undercut the prices they are receiving from Sullivan Tire to take the business, without having to engage in its own efforts or use its own resources to identify and market to those customers and form relationships with them.

92.    It is for this reason that Sullivan Tire negotiated the restrictive covenant set forth in Section 10B of the APA, which prohibits the Therriens from ever operating a tire sales and service business within 50 miles of Central's former facilities using Central's confidential information – which includes the identities of Central's customers.

21

93.     Sullivan Tire's sales to: i) the five foregoing customers observed at Central's Sanford business premises; ii) the two customers who acknowledged purchasing tires from Central (Berube Equipment, Inc. and Brex Corp.); and iii) the customer observed speaking with Doug on May 13, 2026 (Foglio, Inc.), are down by over eighty percent (80%) through the first four months of 2026 as compared to 2025.  In addition, the overall profits at the Sanford location are down over 20%, resulting in a loss of profits of more than $133,000 for the first four months of 2026 alone. The corresponding loss of customer goodwill is immeasurable.

94.     The loss in sales is directly attributable to sales made by Doug, Jeff, and Central to existing Sullivan Tire customers, including customers that had done business with Central prior to its sale of assets to Sullivan Tire in violation of the APA and Employee Handbook.

95.      The winter months tend to be slower months for tire sales in the commercial market served by Sullivan Tire.  Thus, Sullivan Tire expects that the losses it has sustained as a result of Defendants' conduct to increase for the remainder of the year.

## COUNT I

### BREACH OF CONTRACT
### (Against All Defendants)

96.     Plaintiffs repeat and reallege all of the preceding allegations as if fully set forth herein.

97.     The APA between the parties constituted a binding and enforceable agreement under the common laws of Maine.

98.     Sullivan Tire complied with all its obligations under the APA, including by paying the purchase price for the assets purchased from Central and Rene.

99.     As stated in Section 10(B) of the APA, Rene, as Seller Shareholder, agreed that he would "not use, or permit any family members . . . to use, any proprietary or confidential

22

information of Seller [Central], including but not limited to sales methods and customer lists, in any Competing Business", with the term "Competing Business" defined as any tire and/or automotive service business within fifty (50) miles from Central's Sanford or Shawmut locations.

100. Section 10(B) of the APA further provides that Rene "shall be liable for any actions taken by any of such family members that would be deemed a breach of this Agreement as if the Seller [or] Seller Shareholder . . . had taken those actions directly."

101. The term "Competing Business" is defined in Section 10(A) as "any tire and/or automotive service business in an area that is within fifty miles from the Sanford Location or the Shawmut Location."

102. Rene signed the APA on behalf of Central in his capacity as owner, and on his own behalf, as Seller Shareholder.

103. Doug and Jeff signed the APA "For purposes of Section 10 only", acknowledging their agreement to the restriction set forth in Section 10(B).

104. As described herein, Doug and Jeff have breached the APA by engaging in a Competing Business using the proprietary and confidential information of Central.

105. As a result, Sullivan Tire has suffered the loss of customer goodwill and customer relationships, as well as financial damages in the form of lost profits.

## <u>COUNT II</u>

### **BREACH OF CONTRACT**
### **(Against Central and Rene)**

106. Plaintiffs repeat and reallege all of the preceding allegations as if fully set forth herein.

107. The Bill of Sale between Central, as Seller, Rene, as Seller Shareholder, and Sullivan Tire ME, as Buyer, constituted a binding and enforceable agreement under the common laws of Maine.

108. Sullivan Tire ME complied with all its obligations under the Bill of Sale, including by paying the purchase price for the assets purchased from Central and Rene.

109. As evidenced by the Bill of Sale, Rene and Central sold the trade name "Central Tire" and all other names under which Central had previously operated to Sullivan Tire.

110. By permitting and participating in the operation of a new tire sales and service business under the trade name Central Tire, Central and Rene have breached the Bill of Sale.

111. As a result, Sullivan Tire has suffered the loss of customer goodwill and customer relationships, as well as financial damages in the form of lost profits.

## COUNT III

### VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016 ("DTSA")
### (Against All Defendants)

112. Plaintiffs repeat and reallege all of the preceding allegations as if fully set forth herein.

113. The MUTSA, 18 U.S.C. § 1836 et seq., prohibits the misappropriation of Sullivan Tire's trade secrets and imposes both civil and criminal penalties for such misappropriation.

114. The identities of Sulivan Tire's customers, its customers' contact information, and the pricing and discounts it provides to those customers constitute trade secrets of Sullivan Tire under 18 U.S.C. § 1839(3).

115. As described herein, Sullivan Tire takes reasonable measures to protect its trade secrets and derives independent economic value from that information not being generally known or readily ascertainable through proper means.

24

116.   Through their employment at Sullivan Tire and agreement to the terms of its Employee Handbook, Doug and Jeff committed to maintain the secrecy of Sullivan Tire's confidential and proprietary information.

117.   As described herein, Doug and Jeff, acting on behalf of themselves, Central, and its shareholder, Rene, misappropriated Sullivan Tire's trade secrets when they: (i) lied about their intentions following the termination of their employment with Sullivan Tire in order to maintain access to Sullivan Tire's systems and facilities, (ii) removed physical files and notes as well as a computer tower and computer server from Sullivan Tire's Sanford, Maine location, and (iii) accessed confidential and proprietary information on the computer.

118.   Defendants' actions, as described herein, constitute "misappropriation" by "improper means" under 18 U.S.C. §§ 1839(5)(A) and 6(A).

119.   The trade secrets Defendants misappropriated, as described herein, are related to the products and services Sullivan Tire offers, or intends to offer, in interstate commerce.

120.   Defendants have not only misappropriated trade secrets from Sullivan Tire, they prevented Sullivan Tire from using its own information to compete with Defendants by permanently deleting hundreds of computer files before returning the computer and server to Sullivan Tire.

121.   Defendants' actions, as described herein, were "willful and malicious" under 18 U.S.C. § 1836(b)(3)(C).

122.   As a result of Defendants' willful and malicious misappropriation of Sullivan Tire's trade secrets, Sullivan Tire has sustained actual losses, including business revenues and the loss of customer goodwill.

## COUNT IV

### VIOLATION OF THE MAINE UNIFORM TRADE SECRETS ACT ("MUTSA")
#### (Against all Defendants)

123.    Plaintiffs repeat and reallege all of the preceding allegations as if fully set forth herein.

124.    The MUTSA, 10 M.R.S. Ch. 302, prohibits the misappropriation of Sullivan Tire's trade secrets.

125.    The identities of Sulivan Tire's customers, its customers' contact information, and the pricing and discounts it provides to those customers constitute trade secrets of Sullivan Tire under 10 M.R.S. § 1542(4).

126.    As described herein, Sullivan Tire takes reasonable measures to protect its trade secrets and derives independent economic value from this information not being generally known or readily ascertainable through proper means.

127.    Through their employment at Sullivan Tire and agreement to the terms of its Employee Handbook, Doug and Jeff committed to maintain the secrecy of Sullivan Tire's confidential and proprietary information.

128.    As described herein, Doug and Jeff, acting on behalf of themselves, Central, and its shareholder, Rene, misappropriated Sullivan Tire's trade secrets when they: (i) lied about their intentions following the termination of their employment with Sullivan Tire in order to maintain access to Sullivan Tire's systems and facilities, (ii) removed physical files and notes as well as a computer tower and computer server from Sullivan Tire's Sanford, Maine location, and (iii) accessed confidential and proprietary information on the computer.

129.    Defendants' actions, as described herein, constitute "misappropriation" by "improper means" under 10 M.R.S. §§ 1542(1) and (2).

26

130. Defendants have not only misappropriated the trade secrets from Sullivan Tire, they have prevented Sullivan Tire from using its own information to compete with Defendants by deleting hundreds of computer files before returning the computer and server to Sullivan Tire.

131. Defendants' actions, as described herein, were "willful and malicious" under 10 M.R.S. § 1544(2).

132. As a result of Defendants' willful and malicious misappropriation of Sullivan Tire's trade secrets, Sullivan Tire has sustained actual losses, including business revenues and the loss of customer goodwill.

## COUNT V

### VIOLATION OF THE LANHAM ACT
### (Against all Defendants)

133. Plaintiffs repeat and reallege all of the preceding allegations as if fully set forth herein.

134. The Lanham Act, 15 USC §1125(a), forbids false designations of origin, false descriptions, and dilution of trademarks.

135. Upon the closing of the sale of Central Tire's assets to Sullivan Tire ME and through the Bill of Sale, Sullivan Tire ME became the owner of all right, title and interest in and to the trademark, service mark, and trade name "Central Tire" and all other trade names under which the business of Central Tire Co., Inc., was conducted prior to its sale of assets to Sullivan Tire ME, including any stylizations, logo designs, or derivations thereof.

136. Through their actions as alleged herein, Defendants have infringed and will continue to infringe on Plaintiffs' trademarks, including the Central Tire trade name, by using, selling, and reproducing Plaintiffs' trademarks on signage, work uniforms, and written materials distributed on Defendants' behalf.

27

137.    Defendant's use of the trade name "Central Tire" in commerce is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' goods and services, or commercial activities, with Plaintiffs, in violation of 15 USC §1125(a).

138.    As a direct and proximate result of Defendants' infringement of Plaintiffs' trademarks, Plaintiffs have suffered, and continue to suffer damages to their profits, sales, business and reputation, and are entitled to recover damages in an amount to be proven at trial.

139.    Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

140.    Defendants conduct was, and continues to be willful, and Plaintiffs are entitled to an award of treble damages pursuant to 15 U.S.C. § 1117.

141.    Due at least to the willfulness of Defendant's conduct, this should be considered an exceptional case within the meaning of 15 U.S.C. § 1117(a), thereby entitling Plaintiff to an award of attorney fees and costs.

## COUNT VI

### UNJUST ENRICHMENT
### (Against all Defendants)

142.    Plaintiffs repeat and reallege all of the preceding allegations as if fully set forth herein.

143.    By purchasing the assets of Central, including its confidential and proprietary information, and employing Doug and Jeff, thereby providing Defendants with access to Sullivan Tire's confidential and proprietary information, Sullivan Tire conferred a benefit on the Defendants.

144.    The Defendants had knowledge that they were benefitting from the sale of Central's assets to Sullivan Tire, their employment with Sullivan Tire, and access to Sullivan Tire's confidential and proprietary information.

145.    Defendants' acceptance and retention of those benefits makes it inequitable for them to retain and use Central's and Sullivan Tire's confidential and proprietary information to operate a competing business without payment to Sullivan Tire for its value.

146.    Through their conduct as described herein, Defendants have been unjustly enriched to the detriment of Sullivan Tire.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Sullivan Tire of Maine, LLC and Sullivan Tire Co, Inc. request that this Court:

1.    Enter judgment for Plaintiffs against Defendants on all counts asserted herein, including an award of damages, including multiple damages under Counts III, VI and V, pre-judgment interest and attorneys' fees;

2.    Find that Defendant has engaged in trademark infringement in violation of 15 USC § 1125(a) of the Lanham Act;

3.    Pursuant to 17 USC § 1116, enter an Order preliminarily and permanently enjoining Defendants from operating any business under the trade name "Central Tire" or any other trade name under which the business of Central Tire Co., Inc., was conducted prior to its sale of assets to Sullivan Tire ME;

4.    Enter an Order preliminarily and permanently enjoining Defendants from providing any goods or services to any business or individual that was a customer of Central or Sullivan Tire

29

prior to February 13, 2026, when Jeff Therrien returned the computer and computer server he removed from Sullivan Tire's business premises;

5.     Enter an Order requiring Defendants to identify in writing, under penalties of perjury, within seven (7) days of such Order, all information in their possession, custody, or control belonging to Sullivan Tire or the former Central Tire, whether in the form of physical documents, electronic data or any other form and to identify any copies made of such information;

6.     Enter an Order requiring Defendants to return all information in their possession, custody, or control belonging to Sullivan Tire or the former Central Tire and to destroy all copies of such information;

7.     Maintain jurisdiction over this matter for purposes of enforcing and overseeing Defendants' compliance with any injunctive relief issued; and

8.     Award Plaintiffs any such other relief that the Court deems just and proper.

<div style="margin-left:40%">

PLAINTIFFS – SULLIVAN TIRE OF MAINE, LLC and SULLIVAN TIRE CO., INC.

By its attorneys,

*/s/ James F. Radke*
James F. Radke – Bar No. 004005
Harris Beach Murtha Cullina PLLC
33 Arch Street, 12th Floor
Boston, Massachusetts 02110
617.457.4000
jradke@harrisbeachmurtha.com

</div>

DATED: May 15, 2026

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Ryan McMullen, Commercial Division Manager for Plaintiffs Sullivan Tire of Maine, LLC and Sullivan Tire Co., Inc., declare under the penalties of perjury that I have made a diligent search of available information, and that the facts, assertions and statements in the Verified Complaint are true and accurate to the best of my knowledge and belief based on the information available to me at this time.

SULLIVAN TIRE OF MAINE, LLC and
SULLIVAN TIRE CO., INC.

By: Ryan McMullen

Its: Commercial Division Manager

Date: 5·15·26

31