UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SULLIVAN TIRE OF MAINE, LLC, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 2:26-cv-00257-JAW |
| CENTAL TIRE CO., INC., et al., | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

A tire company claims that, after purchasing a local tire business's assets, members of the sellers' family violated several laws as well as an asset purchase agreement by establishing a competing tire business, serving customers of the purchased business, using confidential business information and the former business's trade name. Plaintiffs filed a motion for preliminary injunction seeking to restrict defendants' use of the trade name and service of former customers and to require the return and destruction of certain business information. Concluding plaintiffs have not shown a likelihood of irreparable harm because their alleged loss of customer business is susceptible to monetary calculation, the Court denies the motion for preliminary injunction.

## I. BACKGROUND

### A. Procedural History

On May 15, 2026, Sullivan Tire of Maine, LLC and Sullivan Tire, Co., Inc. (collectively, Plaintiffs or Sullivan Tire) filed a verified complaint against Central Tire Co., Inc., Rene Therrien, Douglas Therrien, and Jeffery Therrien (collectively, Defendants), raising claims for breach of contract, unjust enrichment, and violations of the Lanham Act, the Maine Defend Trade Secrets Act, and the Maine Uniform Trade Secrets Act. *Verified Compl. (Inj. Relief Sought)* ¶¶ 96-146 (ECF No. 1) (*Compl.*). Among other remedies, Plaintiffs seek immediate injunctive relief. *Id.* at 4. That same day, Plaintiffs also filed a motion for preliminary injunction. *Mot. for Prelim. Inj. (Req. for Immediate Relief)* (ECF No. 5) *(Pls.' Mot.).* On June 25, 2026, Defendants filed their opposition to Sullivan Tire's motion for preliminary injunction. *Defs.' Opp'n to Mot. for Prelim. Inj.* (ECF No. 22) (*Defs.' Opp'n*). On July 9, 2026, Sullivan Tire filed its reply. *Pls.' Repl. Mem. in Suppt. of Mot. for Prelim. Inj.* (ECF No. 27) (*Pls.' Reply*). The Court heard oral argument on August 27, 2026.[1]

**B. Factual Background[2]**

This case concerns a business dispute arising from Sullivan Tire of Maine, LLC's purchase of certain assets of Central Tire Co., Inc., including its goodwill, customer lists, trade names, and other intellectual property, and Defendants' subsequent operation of a competing tire sales and service business in Sanford, Maine. *Compl.* ¶¶ 1-4, 17-27. Sullivan Tire alleges that Defendants have used the

---

1 On October 16, 2026, Sullivan Tire filed a motion for leave to supplement the record. *Pl.'s Mot. for Leave to Supplement the R. on Their Pending Mot. for Prelim. Inj.* (ECF 36). The Court DENIES this motion because even if the Court considered the new evidence, it would not alter the outcome.

2 For the purposes of the requested preliminary injunction, the Court reviews the relevant facts as pleaded in the verified complaint and the declarations submitted by the parties, which the Court takes as true at this stage of the proceeding.

"Central Tire" name and confidential and proprietary information now belonging to Sullivan Tire to compete for former Central Tire and current Sullivan Tire customers, in violation of the parties' contractual agreements and federal and state law. *Id.* ¶¶ 1-4. The Court rules only on the narrower question of whether Sullivan Tire has established its entitlement to preliminary injunctive relief while this litigation proceeds. *Pls.' Mot.* at 1-2.

**1. The Plaintiffs**

Plaintiffs are two affiliated business entities. Sullivan Tire Co., Inc., (Sullivan Tire Co.) is a Massachusetts corporation with its principal place of business in Norwell, Massachusetts. *Compl.* ¶ 5. Established in 1955, Sullivan Tire Co. is a family business that sells tires and performs automotive repair services in New England. *Id.* ¶ 15. Sullivan Tire of Maine, LLC (Sullivan Tire ME) is a limited liability company organized under the laws of Delaware with a principal place of business in Norwell, Massachusetts. *Id.* ¶ 6. Sullivan Tire ME's sole member is Sullivan Tire, Inc., a Delaware corporation with a principal place of business in Norwell, Massachusetts. *Id.*

**2. The Defendants**

Defendants are a Maine business and several individuals. Central Tire Co., Inc. (Central) is a corporation organized under the laws of Maine with a principal place of business in Sanford, Maine. *Id.* ¶ 7. Prior to its sale of certain assets to Sullivan Tire, Central operated two commercial tire sales and service locations in Sanford and Shawmut, Maine. *Id.* ¶ 16. Central also operates a commercial tire re-

treading business from a plant in Sanford, Maine, where Central allegedly continues to conduct business. *Id.* Rene Therrien is a resident of Springvale, Maine and the sole shareholder of Central. *Id.* ¶ 8. Rene's sons, Doug Therrien and Jeff Therrien are residents of Waterboro and Springvale, Maine, respectively. *Id.* ¶¶ 9-10.

### 3. Sullivan Tire's Purchase of Central's Tire Sales and Business Services

On September 27, 2022, Sullivan Tire ME entered into an agreement with Central and Rene Therrien, as Central's sole shareholder, to purchase Central's tire sales and service business assets. *Id.* ¶¶ 17-18. The sale of assets covered by the Asset Purchase Agreement (APA) closed on October 12, 2022, as evidenced by a bill of sale. *Id.* ¶ 19; *id.*, Attach. 2, *Bill of Sale*. As indicated in the Bille of Sale, Sullivan Tire ME purchased the following assets from Central, among others:

> a) All of the goodwill of the Business known as Central Tire Co., Inc. as operated by Seller;
>
> b) All trade names or other names under which Central Tire Co., Inc., business is conducted by Seller, including but not limited to any signage and other materials containing and displaying such names;
>
> c) Seller's intellectual property (as defined in a certain Asset Purchase and Sale Agreement Signed by the Sellers and Buyers), including without limitation the specific Intellectual Property as set forth on Exhibit 1A(c) of said Asset Purchase and Sale Agreement;
>
> d) All of fixtures inventory . . . contracts (including without limitation leases and subleases), licenses (to the extent transferrable), vendor lists, customer lists, and books and records which were excluded in said Asset and Purchase and Sale Agreement;

*Id.* ¶ 22; *Bill of Sale*.

Section 10 of the APA includes two restrictive covenants. First, Section 10A prohibits Rene and any related parties, which include Doug and Jeff Therrien, from

engaging in any tire and/or automotive service business within 50 miles of Central's Sanford and Shawmut locations for two years following the closing of the sale. *Id.* ¶ 23; *APA* at 18. Doug and Jeff Therrien, Rene's sons and Central senior employees at the time, executed the APA as to Section 10. *Id.* ¶ 18; *APA* at 20.

Second, Section 10B provides that Central and Rene Therrien:

> Shall not use, or permit any family members of Seller Shareholder or Seller Shareholder Spouse to use, any proprietary or confidential information of Seller, including but not limited to sales methods and customer lists, in any Competing Business, and shall be liable for any actions taken by any of such family members that would be deemed a breach of this Agreement as if the Seller [or] Seller Shareholder . . . had taken those actions directly.

*Id.* ¶ 24; *APA* at 18. The term "Competing Business" is defined in Section 10 as any tire and/or automative service business within 50 miles from the Sanford or Shawmut locations. *Id.*

**4. Doug and Jeff Therrien's Employment at Sulliven Tire ME**

Following the sale of Central's assets to Sullivan Tire, Doug and Jeff worked for Sullivan Tire Co. in management-level positions at the Sanford location. *Id.* ¶ 28. Jeff served as an assistant manager for the entirety of his employment at the Sanford location, and Doug served as the manager of the Sanford location for approximately one year before transitioning to a sales role for the remainder of his employment. *Id.* ¶ 29. In October 2022, when Doug and Jeff began working for Sullivan Tire, Co., they each received a copy of the Sullivan Tire and Auto Service Employee Handbook (the Employee Handbook) and signed an acknowledgement form acknowledging their receipt of the Employee Handbook. *Id.* ¶ 30.

The Employee Handbook includes provisions regarding confidential and proprietary information. The Employee Handbook states that "[a]ll information pertaining to Sullivan Tire, its customers, employees, and visitors is strictly confidential, even after your employment ends. . ." *Id.* ¶ 31, *id.* Attach. 3, *Employee Handbook* at 26-27.

> **<u>Confidential Information</u>**
>
> All information pertaining to Sullivan Tire, its customers, employees, and visitors is strictly confidential, even after your employment ends. It is the responsibility of each employee to ensure that information is not improperly or accidentally disclosed. Confidential information includes, but is not limited to, contents of customers' vehicles, dates or nature of service, names and addresses of customers, and any other information pertinent to Sullivan Tire customers. In addition, this Policy applies to any and all records, memorandums, strategies, customer lists and prospects and employee information, such as social security number, home addresses, and telephone numbers. As such, they are to be carefully safeguarded and kept current, relevant, and accurate. Records should be disclosed only to authorized Sullivan Tire employees having a "need to know," or pursuant to lawful process in accordance with Sullivan Tire procedures governing the permissibility and means of disclosure. Such information should not be disclosed to third parties except as expressly permitted in Sullivan Tire procedures or if Sullivan Tire becomes legally obligated to do so. A Sullivan Tire employee having any questions about any such required disclosure should consult with the Human Resources Department prior to complying with such requirements. All Sullivan Tire employees should use discretion and not discuss Sullivan Tire business in any place or manner that risks violation of the confidentiality of customer information.
>
> **<u>Proprietary Information</u>**
>
> Proprietary information about Sullivan Tire and its plans, financial condition and earnings, and business operations and processes, is confidential and may not be disclosed to any person. Sullivan Tire employees should use care not to discuss Sullivan Tire business in any place or manner that would in any way impair its competitive position in the industry. Information about

> Sullivan Tire should not be given to persons outside Sullivan Tire unless it has been previously disclosed publicly. Requests for such information should be referred to Human Resources.

*Id.*

Per these policies, all information pertaining to Sullivan Tire's customers, including their names, addresses, and contact information, as well as the pricing those customers receive on their tire purchases from Sullivan Tire, is considered confidential. *Compl.* ¶ 32. In addition to their confidential and proprietary information policies, Plaintiffs take several measures to protect its confidential and proprietary information: all employees use unique passwords to access Sullivan Tires systems, which are changed every 12 months, access to certain information and systems is limited based on employee role and controlled by authentication, keys are required to enter Sullivan Tire buildings and key cards are required to access the company sites that house data center and server rooms, and logs are maintained of access and attempted access to those rooms. *Id.* ¶ 33.

Given their managerial roles with Sullivan Tire, Doug and Jeff both had access to the company's confidential and proprietary information, including information that identified customers and the pricing they received on tires. *Id.* ¶ 34. Eventually, Doug and Jeff resigned from their positions at Sullivan Tire. Around this time, Doug and Jeff made several representations about their reasons for resigning and asserted they had no future plans to work for a competitor in the tire business. *Id.* ¶¶ 35, 38-39. Jeff and Doug both stated their desire to scale back to part-time work outside the tire business. *Id.* Jeff said that he and Doug were renting the former Central Tire retreading plaint in Sanford to a utility company, and he planned to work part time

maintaining that company's trucks. *Id.* ¶¶ 39, *id.*, Attach. 5 *Doug's Resignation Email* (indicated he was not leaving to join a competitor, but rather, planned "to scale back and do [his] State of Maine commercial inspections & work two days a week for tenant (Holland Power)"). He also said that he and his brother intended to continue to operate as a commercial vehicle inspection site from the Sanford site, which is an ongoing business that the Therrien family operates on Saturdays. *Id.*

Doug's last day was October 31, 2025. *Id.*¶ 35. Just prior to his last day of work, Doug reported he was "tired and burned out." *Id.*¶ 38. Jeff's last day was January 5, 2026. Jeff indicated he needed time off address family matters and spend time with his kids and no longer wanted to work a full-time job. *Id.* ¶ 39.

**5. Jeff Therrien's Removal of Central Tire Files and Computer Equipment**

Following Sullivan Tire's purchase of Central's assets, Central's physical business files remained in filing cabinets in an office at the Sanford premises, along with a Dell desktop computer and computer server that had previously belonged to Central. *Compl.* ¶¶ 43-44. Sullivan Tire employees continued to consult the physical and electronic files on Central's computer when they needed contact information for customers who had previously purchased tires or services from Central. *Id.* ¶ 44.

Sometime between December 31, 2025 and January 2, 2026, Jeff entered the Sanford premises using a key he possessed in his capacity as landlord and removed filing cabinets containing Central's physical files, as well as the Dell desktop computer and computer server. *Id.* ¶¶ 45-47. Sullivan Tire alleges that Jeff also removed notes and other materials created after Sullivan Tire's acquisition

containing customer contact information, customer leads, and other notations. *Id.* ¶ 47.

On February 13, 2026, Jeff returned the Dell desktop computer and server to Sullivan Tire. *Id.* ¶ 51. Sullivan Tire thereafter retained a computer-forensics firm to examine the Dell computer. *Id.* ¶ 55. According to Sullivan Tire, the forensic examination showed that, on January 10 and 12, 2026, 111 folders and files within Jeff's user profile were accessed and 196 files were permanently deleted. *Id.* The files accessed included two customer lists. *Id.* ¶¶ 55-57. One, titled "ExternalList1.csv," identified thirty businesses and municipalities and included their telephone numbers; Sullivan Tire alleges that at least eleven of those entities were then-current Sullivan Tire customers. *Id.* ¶ 56. The second, titled "PHONELIST.xls," identified eighty businesses, at least thirty-five of which were then-current Sullivan Tire customers. *Id.* ¶ 57. Because two customers appeared on both lists, Sullivan Tire alleges that the two files collectively identified at least forty-four unique then-current Sullivan Tire customers. *Id.* ¶¶ 3, 56-57.

**6. Defendants' Current Tire Sales and Service Business**

Following Jeff's resignation, Sullivan Tire alleges that Doug and Jeff began operating a commercial tire sales and retreading business from Central's property at 122 Cyro Drive in Sanford under the "Central Tire" name. *Id.* ¶¶ 58-60. In February 2026, an internet search showed a business operating under that name at the Cyro Drive address. *Id.* ¶ 62. On February 18, 2026, Sullivan Tire demanded that Defendants cease using the Central Tire trade name. *Id.* ¶ 65. Defendants

responded the next day that they would "immediately cease-and-desist all business operations using the Central Tire trade name." *Id.* ¶ 66.

Sullivan Tire alleges that Defendants nevertheless continued to use the Central Tire name, pointing to March and April 2026 dealer-program records identifying "Central Tire, Co." and "Central Tire Company" at a Sanford address. *Id.* ¶¶ 68-71. On April 3, 2026, a Sullivan Tire employee also observed a tire technician unloading tires at Defendants' premises while wearing a "Central Tire" shirt. *Id.* ¶¶ 59, 86-87. Sullivan Tire also alleges that Defendants were doing business with at least five of Sullivan Tire's existing customers. *Id.* ¶¶ 88-89. On April 3, 2026, a Sullivan Tire employee observed vehicles belonging to five companies at Defendants' Cyro Drive premises . *Id.* ¶ 88. Each was a former Central customer and an existing Sullivan Tire customer. *Id.* ¶ 89.

**7. Sullivan Tire's Alleged Loss of Customers and Profits**

Sullivan Tire alleges that Defendants' competing business has caused a substantial decline in its sales and profits. *Id.* ¶¶ 93-95. During the first four months of 2026, Sullivan Tire's sales to eight identified customers allegedly transacting with Central declined by "over eighty percent (80%)" compared with the same period in 2025. *Id.* ¶ 93. Sullivan Tire further alleges that overall profits at its Sanford location declined by more than twenty percent during that same period, resulting in "a loss of profits of more than $133,000." *Id.* Sullivan Tire attributes the decline to sales by Doug, Jeff, and Central to existing Sullivan Tire customers, including former Central customers. *Id.* ¶ 94. Sullivan Tire further alleges that, because the winter

months are typically slower for commercial tire sales, the losses sustained during the first four months of 2026 will increase over the remainder of the year. *Id.* ¶ 95. In addition to these financial losses, Sullivan Tire alleges a "corresponding loss of customer goodwill," which it describes as "immeasurable." *Id.* ¶ 93.

Based on this alleged conduct, Sullivan Tire brings six claims. Counts One and Two allege breach of contract based on the APA and Bill of Sale, respectively. *Id.* ¶¶ 96-111. Counts Three and Four allege violations of the Defend Trade Secrets Act (DTSA) and Maine Uniform Trade Secrets Act (MUTSA). *Id.* ¶¶ 112-132. Count Five alleges a violation of the Lanham Act, and Count Six alleges unjust enrichment. *Id.* ¶¶ 133-146.

## II. THE PARTIES' POSITIONS

### A. Plaintiffs' Motion for Preliminary Injunction

Sullivan Tire seeks a preliminary injunction enjoining Defendants from operating under the "Central Tire" name and from providing goods or services to customers of Central or Sullivan Tire before February 13, 2026, and requiring Defendants to identify, return, and destroy information belonging to Sullivan Tire. *Pls.' Mot.* at 20. Applying the four-factor preliminary injunction test, Sullivan Tire first argues it is likely to succeed on each of the six claims in its Verified Complaint. *Id.* at 12-20.

As to its breach-of-contract claims, Sullivan Tire argues that Defendants are operating a "Competing Business using the former Central Tire's "proprietary and confidential information in violation of Section 10.B of the APA" and using the

"Central Tire" name transferred through the Bill of Sale. *Id.* at 13. Sullivan Tire emphasizes that, unlike the two-year general noncompetition provision, Section 10.B contains no temporal limitation. *Id.* at 14.

Sullivan Tire next argues it is likely to succeed on its DTSA and MUTSA claims because the identities of its customers, combined with customer-specific "pricing and discounts" constitute protected trade secrets. *Id.* at 15. Relying on *Allstate Insurance Co. v. Fougere*, 79 F.4th 172, 189 (1st Cir. 2023), Sullivan Tire maintains that compilations of customer information may qualify as trade secrets even when some component information is publicly available. *Id.* at 15-16.

Sullivan Tire also argues it is likely to succeed on its Lanham Act claim because Defendants' use of the "Central Tire" name in the same geographic area is "likely to cause confusion in the marketplace" regarding the businesses' affiliation, personnel, services, and locations. *Id.* at 18. Finally, it argues Defendants were unjustly enriched because they "accepted the benefits of the sale of their business," while using assets sold to Sullivan Tire and confidential information they were obligated to protect to compete against plaintiffs. *Id.* at 18.

Turning to irreparable harm, Sullivan Tire maintains that Defendants have disrupted the customer relationships and goodwill it purchased from Central. *Id.* at 18-19. It points to sales declines of more than eighty percent among eight identified customers and more than $133,000 in lost profits during the first four months of 2026 but maintains that the harm extends beyond those calculable losses to an "immeasurable loss of customer goodwill." *Id.* at 19. Relying on *Everett J. Prescott,*

*Inc. v. Ross*, 383 F. Supp. 2d 180, 192 (D. Me. 2005), Sullivan Tire argues that interests in goodwill, customer contacts, and referral sources cannot be measured in numerical or monetary terms and that damages cannot readily account for the future business generated by a lost customer relationship. *Id.* at 19.

Finally, Sullivan Tire argues both the balance of equities and the public interest favor preliminary relief. It contends that it "acquired the rights to the Central Tire name and to all of the customer goodwill owned by the Central business" and has spent several years maintaining those relationships. *Id.* Sullivan Tire further maintains that the public has an interest in enforcing "contractual agreements and intellectual property rights" and that the public interest would not be served by allowing business owners to "sell their businesses, accept payment, and then simply begin operating the same business" despite contractual restrictions against doing so. *Id.* at 19-20.

**B. Defendants' Opposition**

Defendants urge the Court to deny preliminary relief, arguing that Sullivan Tire "bargained for and received a two-year noncompete agreement, not a perpetual one," and that Sullivan Tire's requested injunction would effectively prevent Doug and Jeff from servicing former Central customers even well after the noncompete expired. *Defs.' Opp'n* at 2-3, 17. Defendants maintain that the APA does not prohibit Doug and Jeff from competing with Sullivan Tire or serving former Central customers, provided they do so without using confidential or proprietary information. *Id.* at 17. Defendants also maintain that Doug and Jeff are operating a small

commercial tire business using their "general industry knowledge, business sense, extensive personal experience, and personalities," rather than Sullivan Tire's confidential information, and that their customers sought them out and were not solicited. *Id.* at 2, 7-8.

Regarding likelihood of success on the merits, Defendants first argue that Sullivan Tire "never used nor even intended to use the 'Central Tire' mark in commerce." *Id.* at 8. They contend that Sullivan Tire therefore abandoned any rights it acquired in the mark and that, by October 2025, "the mark had returned to the public domain." *Id.* at 8-9. Defendants further argue that Sullivan Tire has failed to identify the alleged trade secrets with "sufficient specificity" and that "Defendants have not used any 'trade secrets' or 'confidential or proprietary information' in their current business." *Id.* at 11, 13-14. Instead, Defendants maintain that Doug and Jeff's customers sought them out because of their "innate skills, non-confidential industry know-how that they developed over a lifetime in this business, and longstanding personal relationships." *Id.* at 10. Finally, Defendants reject Sullivan Tire's interpretation of Section 10.B, arguing that if selling tires to a former Central customer constitutes "us[ing] confidential or proprietary information," then Section 10.A's two-year noncompetition provision would be "meaningless and superfluous." *Id.* at 16. Defendants conclude that Sullivan Tire "bargained for and received a two-year noncompete agreement, not a perpetual one." *Id.* at 17.

Next, Defendants argue that Sullivan Tire cannot establish irreparable harm because the remaining alleged injury is compensable through money damages. *Id.* at

18-19. They note that they voluntarily stopped using the "Central Tire" name in February 2026 and have allegedly offered to return or permit inspection of disputed documents and computer files. *Id.* at 18. As to Sullivan Tire's claimed loss of customers and profits, Defendants emphasize that Sullivan Tire has calculated its lost profits from the first few months of 2026 and should therefore not be entitled to injunctive relief. *Id.* at 18-19.

Finally, Defendants argue that the balance of harms and the public interest favor denying relief. *Id.* at 19-20. They contend that the requested customer restriction would "kill the business," affecting Doug, Jeff, and their four full-time employees, while Sullivan Tire's claimed economic losses may be remedied through damages. *Id.* at 18-19. Defendants further argue that Maine public policy favors employee mobility and competition and that preventing them from servicing customers who sought them out would harm both competition and those customers. *Id.* at 20.

### C. Plaintiffs' Reply

In reply, Sullivan Tire rejects Defendants' characterization of the requested relief as a perpetual noncompetition agreement, arguing that it is "merely seeking to enforce the restriction negotiated by the parties concerning Defendants' use of the selling party's proprietary and confidential information" under Section 10.B. *Pls.' Reply* at 2-3. Sullivan Tire emphasizes that Section 10.B "contains no expiration date" and expressly defines Central's proprietary and confidential information as "including, but not limited to sales methods and customers lists." *Id.* at 3-4.

As to irreparable harm, Sullivan Tire argues that Defendants have "recaptured 50-70 customer relationships" and that the resulting loss of those relationships and goodwill "cannot be remedied by money damages alone." *Id.* at 4. Finally, Sullivan Tire argues that Defendants have not established abandonment of the Central Tire mark and that its customer lists constitute trade secrets, pointing to the forensic evidence concerning Jeff's access to the Dell desktop. *Id.* at 5-7. Sullivan Tire maintains that the balance of harms favors relief because it "will continue to lose the customer relationships for which it paid," while Defendants could service the same customers outside the fifty-mile restriction. *Id.* at 7.

## III. LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting 11A Wright & Miller's Federal Practice & Procedure (2d ed. 1995)). (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). It is "never awarded as a matter of right." *Munaf*, 553 U.S. at 690. To succeed on a motion for preliminary injunction, the movant must establish four elements: (1) substantial likelihood of success on the merits; (2) a high likelihood of irreparable harm if injunctive relief is not granted; (3) a balance of equities tips in the movant's favor; and (4) the injunctive relief is in the public interest. *Voice of the Arab World*, 645 F.3d at 32 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The most important of the four elements is the likelihood of success on the merits—which is considered the "sine qua non" of the

inquiry. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). Trial courts enjoy wide discretion in making judgments regarding the appropriateness of preliminary injunctive relief. *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004).

## IV. DISCUSSION

### A. Plaintiffs' Reply Irreparable Harm

The Court begins and ends with irreparable harm. A plaintiff must demonstrate likelihood of irreparable injury before preliminary relief may issue. *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief"). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). To sustain its burden in establishing its entitlement to a preliminary injunction, Sullivan Tire must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

It is a long-standing axiom that "economic harm in and of itself is not sufficient to constitute irreparable injury." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,* 839 F. Supp. 68, 74–75 (D. Me. 1993) (citations omitted). Speculative injury "does not constitute a showing of irreparable harm." *Id*. *Merrill Lynch* found the plaintiff's claims of loss of goodwill and future economic injury arising from the defendant's alleged breach of a non-competition agreement were speculative. *Id* (emphasizing that "[l]oss of good will is frequently valued and recompensed in litigation" and that "claims for future economic loss of every manner and description are the very staple of civil litigation"). A purely economic injury ordinarily does not constitute irreparable harm where it can be adequately remedied through an award of money damages. *See Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) (vacating the preliminary injunction, concluding "[w]e do not find irreparable injury where only money is at stake and where the plaintiff has a satisfactory remedy at law to recover the money at issue"); *McDonough v. Trustees of Univ. Sys.*, 704 F.2d 780, 784 n.2 (1st Cir. 1983) ("[B]ecause money damages would seem to offer a complete remedy, the requirement of irreparable injury would also be a formidable obstacle to the grant of a preliminary injunction').

Similarly, in *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151 (1st Cir. 2004), investors sought to freeze the assets of a company from which they sought damages arising from an alleged breach of contract. *Id.* at 154-55. The First Circuit affirmed the denial of preliminary relief, explaining that "[i]rreparable harm most often exists where a party has no adequate remedy at law." *Id.* at 162. Because

an eventual award of pecuniary damages would "make [the plaintiffs] whole," a "legal remedy [was] adequate." *Id.* The First Circuit further emphasized that "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Id.*

Sullivan Tire nevertheless maintains that its injury extends beyond lost sales and profits because Defendants have "recaptured 50-70 customer relationships," causing Sullivan Tire to lose "those relationships and their business . . . for years to come." *Pls.' Reply* at 4. Sullivan Tire contends that "[t]hese harms cannot be remedied by money damages alone." *Id.* There is authority for the proposition that such losses may constitute irreparable harm. In *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989), for example, K-Mart's landlord built retail buildings in violation of the parties' lease, thereby reducing parking, increasing traffic congestion, and obstructing K-Mart's "store and signage." *Id.* at 910. In affirming injunctive relief, the First Circuit began from the same principle applicable here: "[t]he necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies," such that "if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *Id.* at 914. On the particular record before it, however, the appeals court concluded that the district court did not clearly err in finding irreparable harm because damage to K-Mart's goodwill was "not readily measurable or fully compensable in damages" and the effect of "diminished visibility, restricted access, less commodious parking" was "sufficiently problematic as to defy precise dollar quantification." *Id.* at 915

*K-Mart* does not displace the First Circuit's general rule that compensable economic losses are not irreparable. Rather, it illustrates circumstances in which the movant demonstrated that the economic consequences of the challenged conduct could not readily be measured or fully compensated. The Court therefore considers whether Sullivan Tire has demonstrated that the particular losses it faces absent preliminary relief cannot adequately be measured and remedied through an eventual award of damages, and concludes that Sullivan Tire has not identified a comparable difficulty in measuring the ongoing injury it seeks to prevent: the loss of business from identifiable former Central Tire customers.

Sullivan Tire itself asserts that sales to eight identified customers "are down by over eighty percent (80%) through the first four months of 2026 as compared to 2025" and that overall profits at the Sanford location "are down over 20%, resulting in lost profits exceeding $133,000 in the first four months of 2026 alone." *Pls.' Mot.* at 11. Sullivan Tire further attributes "[t]his loss in sales and customer goodwill" to Defendants' sales to existing Sullivan Tire customers. *Id.* at 11-12. Sullivan Tire's own evidence thus demonstrates that the alleged diversion of customer business can be identified, tracked, and translated into lost sales and profits.

Defendants also represent that they "voluntarily suspended their use of the 'Central Tire' mark" in February 2026 and have invited Sullivan Tire to inspect their computer and files for information it believes was improperly taken. *Defs.' Opp'n* at 18. Sullivan Tire responds that Defendants have "refused to cease doing business with former Central Tire and Sullivan Tire customers," which it describes as "the

only way to alleviate the harm to Sullivan Tire." *Pls.' Reply* at 5. These submissions further focus Sullivan Tire's asserted ongoing harm on the loss of customer business that its own evidence demonstrates is susceptible to monetary calculation.

The conclusion that Sullivan Tire's asserted losses are compensable through money damages is also consistent with *Web Design & Consulting Servs. Inc. v. Aragon*, No. 2:24-cv-00249-KFW, 2025 U.S. Dist. LEXIS 59749 (D. Me. Mar. 31, 2025). There, the court found no irreparable harm where the plaintiff's lost customers were compensable through damages and the plaintiff had "already calculated its economic losses." *Id.* at *21-22. The same reasoning applies here. Sullivan Tire has identified the customers whose business it claims to have lost and calculated the resulting decline in sales and profits. *See Pls.' Mot.* at 11 (sales to eight identified customers "are down by over eighty percent (80%)" and overall profits at the Sanford location "are down over 20%, resulting in lost profits exceeding $133,000 in the first four months of 2026 alone").

Likewise, the district court in *Jeffries v. United States Postal Service*, No. 2:26-cv-00091-LEW, 2026 U.S. Dist. LEXIS 108127, at *6 (D. Me. May 13, 2026), declined preliminary intervention where the defendant had voluntarily offered substantially the relief sought, observing that "[t]here is no disagreement here that requires my intervention." *Id.* at 5. Here, Defendants similarly represent that they "voluntarily suspended their use of the 'Central Tire' mark" in February 2026 and invited Sullivan Tire to inspect their computer and files for information it believes was improperly taken. *Defs.' Opp'n* at 18.

Sullivan Tire relies on *Everett J. Prescott, Inc. v. Ross*, where the Court concluded that "good will, customer contacts, and referral sources" "cannot be measured in numerical or monetary terms" and that it would be "very difficult to calculate monetary damages" for the loss of a customer relationship producing "an indeterminate amount of business in years to come." *Prescott,* 383 F. Supp. 2d at 192 (internal citations omitted). Sullivan Tire argues that the same reasoning applies because Defendants have "recaptured 50-70 customer relationships," causing Sullivan Tire to lose "those relationships and their business . . . for years to come." *Pls.' Reply* at 4.

The record here is materially different. In *Prescott*, Richard Ross, the former employee, "admitted to soliciting EJP customers" and had "already sold to one EJP customer," prompting the Court to conclude that "[t]here is no need to speculate" that his customer goodwill would result in lost business—"it has already happened." 383 F. Supp. 2d at 192. Here, by contrast, Defendants deny soliciting customers and represent that they have "no interest in expanding their operation." *Defs.' Opp'n* at 18.

Moreover, the facts in *Prescott* were unusual. To be successful in sales in the pipe and valve distribution business, it helps to possess the usual characteristics of a salesperson: product knowledge, experience with inside and outside sales, and an engaging personality. *Prescott,* 383 F. Supp. 2d at 183. But given the uniqueness of the pipe and valve supply business, Mr. Ross possessed an extremely valuable attribute: he had an extraordinary aptitude for calculating multipliers in his head,

which allowed him to negotiate pricing instantaneously with a variety of customers. *Id.* at 184. The court summarized the impact on EJP from the loss of Mr. Ross to a direct competitor:

> For eleven years, Mr. Ross had engaged in outside sales for EJP. He had eleven years of direct personal contact with EJP customers. He can distinguish between EJP's core and occasional customers, between those who negotiate for price and those who do not, between the quick and slow pays. Moreover, because he is so retentive, he is not only aware of EJP's practices regarding multipliers, but also he can presumably use this information to undercut EJP. For example, with his knowledge, he could inform EJP's core customers, unaware of the multiplier effect, that EJP has treated them less generously over the years than their competitors. He could also affect EJP's relationships with the vendors, who have extended multipliers on the assumption they will remain confidential. For eleven years, Mr. Ross had engaged in outside sales for EJP. He had eleven years of direct personal contact with EJP customers. He can distinguish between EJP's core and occasional customers, between those who negotiate for price and those who do not, between the quick and slow pays. Moreover, because he is so retentive, he is not only aware of EJP's practices regarding multipliers, but also he can presumably use this information to undercut EJP. For example, with his knowledge, he could inform EJP's core customers, unaware of the multiplier effect, that EJP has treated them less generously over the years than their competitors. He could also affect EJP's relationships with the vendors, who have extended multipliers on the assumption they will remain confidential.

*Id.* at 190. In the unusual circumstances presented in EJP, the court concluded that the business had established a likely loss of goodwill from the loss of this uncommon employee.

The record in this case differs from the “indeterminate amount of business in years to come” the Court found difficult to value in *Prescott*. 383 F. Supp. 2d at 192 (internal citations omitted). Therefore, unlike the indeterminate future losses at

issue in *Prescott*, Sullivan Tire's claimed customer losses are susceptible to monetary calculation and therefore do not establish irreparable harm.

## V. CONCLUSION

Accordingly, the Court DENIES Plaintiffs Sullivan Tire of Maine, LLC and Sullivan Tire Co., Inc.'s Motion for Preliminary Injunction (Request for Immediate Relief) (ECF No. 5).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of October, 2026